GUY A. THOMPSON, TRUSTEE, APPELLEE, v. FRED F. SHIELDS, APPELLANT.

4 N. W. (2d) 1

FILED MAY 22, 1942. No. 31321.

*Frederick L. Wolff*, for appellant.

*J. A. C. Kennedy, Yale C. Holland* and *L. J. Tierney*, contra.

Heard before SIMMONS, C. J., ROSE, EBERLY, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

The plaintiff, trustee for the Missouri Pacific Railroad Company in Nebraska, debtor, brought this action to recover for freight charges for the transportation of coal over such railroad to defendant, in the total amount of $1,164.48, with interest. The district court directed a verdict for the plaintiff. The defendant appeals.

The plaintiff's petition contains eight causes of action,

setting forth the dates, weights and freight charges of eight cars of coal, shipped over the Missouri Pacific railroad to the defendant, praying for judgment in the total amount of $1,164.48, with interest thereon. The pleadings admit the trusteeship. The defendant's answer, counterclaim and set-off contains a general denial, alleges affirmatively that the railroad company as a common carrier was an insurer of the safe transportation and delivery of all merchandise placed in the plaintiff's possession; that between the dates of August 29, 1939, and April 9, 1940, 102 cargoes, including the eight cargoes described in the plaintiff's petition, were shipped from Pittsburg, Kansas, over plaintiff's railroad to defendant in Omaha; that there was a net total of 250.635 tons of shortage; that is, smaller weights than those charged by the plaintiff in his petition for the eight cargoes, and collected by plaintiff and his railroad from the defendant; 22.93 tons of which plaintiff was charging in his petition, and the remainder of which was by plaintiff illegally collected from the defendant, all at the rate of $2.40 a ton; further, that the 250.635 tons of coal were of the reasonable value of $1.80 a ton; that the overcharge freight collected, with the addition of the coal shortage claimed, totaled the sum of $1,052.64, for which amount, less credits, the defendant prays judgment.

The plaintiff's amended reply and answer to defendant's answer, counterclaim and set-off contains a general denial; alleges that the shipments made were in interstate commerce, subject to tariff rules and regulations promulgated by the United States and by the interstate commerce commission, which commission has control over the carriers in interstate commerce; that the plaintiff, prior to any shipment, filed with the interstate commerce commission and published a tariff covering the shipment of coal; that the shipments in the instant case consisted of washed coal, and that proper freight rates were charged, in accordance with the tariff rules and regulations; denies that it collected illegally any moneys from the defendant by overcharge, but complied with the tariff rules and regulations as re-

quired. A further allegation states that the shipments consisted of washed coal, which was immediately loaded into box cars and, before all the water was drained, was shipped, and that any shortage caused was due to "evaporation, leakage, or otherwise leaving said coal car;" that defendant received the coal delivered to the railroad company for shipment. Defendant's reply to the foregoing pleading contains a general denial and alleges that plaintiff's employees negligently failed and neglected to weigh or ascertain the tare weight, to wit, the true empty weight of the cars described in defendant's answer.

The record discloses that the plaintiff, to make a *prima facie* case, confined his evidence to the eight cargoes of coal. The tipple superintendent, whose duty it is to see that the coal is loaded in the cars, testified to the washing of the coal and cleaning thereof by a flotation process, the loading of the coal into the coal cars, flat or hopper cars; that he saw to it that only cars suitable for hauling such coal were used; that five cars were loaded March 9, 1940, one March 2, and two March 16. With reference to shrinkage, he testified: "In winter time shrinking wouldn't be as much as it would be in dry weather," and "there would be as much as 5 per cent. shrinkage where the weather would be warm;" that there would not be any shrinkage where weather would be cool.

The agent and yardmaster of the Missouri Pacific Railroad Company at Pittsburg, Kansas, testified to receiving the manifests and handling the coal shipments, and that he was familiar with the eight cars, the dates thereof, and that the same were tendered for shipment by the Commercial Fuel Company; the numbers were telephoned to him, were given by him to a conductor, with instructions to bring the cars out of the mine to Cornell, to be left in the train yard, and subsequently shipped to Omaha to defendant. The weights are all shown by exhibits constituting the original weigh tickets. The date shipped was testified to, also the freight charges on the eight cars, and that they constituted interstate shipments. The rate of $2.40 a ton was charged, based on the Cornell scale weight.

The billing clerk and weighmaster of the Missouri Pacific Railroad Company testified to weighing personally the eight cargoes as they went across the scale at Cornell, Kansas. They produced the original scale tickets, showing the weight, tare, gross and net, which tickets were received in evidence. The tare weight is obtained from the stenciled figures on the cars; the gross weight from the weighing of the cars loaded with coal, and the difference between the two constitutes the net weight.

The defendant's evidence discloses that he has been engaged in the coal business at his present location for 20 years; that the only slack coal coming into his yards was the 102 cargoes in controversy here, which were to be delivered to the school board; that the mill or washed coal arrived in the yard on the Missouri Pacific trestle, which held mill coal only. The evidence described the facilities of the yard; the gate constitutes the only entrance and exit; the yard is constantly supervised during each 24-hour period, and the bins that hold the coal are made for such purpose, to exclude the possibility of shortage. The scales used by the defendant were 20-ton Fairbanks truck scales, duly inspected as required by law, and all coal delivered from the yard passed over the scales; the weights were obtained by first weighing the truck empty and then the truck loaded with coal, the difference constituting the net weight. No coal left the yard without being weighed, and there was kept an accurate, detailed account of the weight of each truck leaving the yard involving the 102 cargoes. There is some testimony that incrustation appeared, caused by freezing of water, and water ran off the coal in many instances when it was delivered. Each cargo of coal was personally checked, and the defendant saw the coal from each of the cars dumped into its bin and supervised the loading of the coal into the trucks.

The defendant's counterclaim is based on sections 20-812, 20-813, 20-816, Comp. St. 1929. The law permitting the filing of counterclaim and set-off in cases of this kind is established. See *Chicago & N. W. R. Co. v. Lindell*, 281 U. S. 14, 50 S. Ct. 200, followed by this court in *Indiana Harbor Belt R. Co. v. Alpirn*, 139 Neb. 14, 296 N. W. 158.

The evidence is wholly insufficient to establish a shortage of coal when it arrived at the defendant's yards. There is no evidence of theft; the coal was washed; there is no evidence of evaporation; there is merely a statement that incrustation appeared, due to freezing or to some other cause. There is no evidence that the defendant availed himself of the right to have the coal reweighed at place of destination, as provided for by the tariff. The shortage and the weights applied thereto are based solely upon the defendant's evidence with reference to the weight of the coal over his private scales.

The question to be determined here is with reference to the exclusion of the defendant's testimony of the 1,202 weigh tickets, as shown by the private scales, the slips evidencing the weights, and the shortage evidenced by comparison with the carrier's weights. The shipment of coal involved constituted interstate commerce. There can be no question that the interstate commerce commission has power and authority, as directed and authorized by congress, to regulate interstate commerce. See 49 U. S. C. A. secs. 11, 12, creating the commission and giving it regulatory powers. The transcript in the instant case contains copy of the tariff filed by the carrier as required by law.

49 U. S. C. A. sec. 6 (7) provides in part: "No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of * * * property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of * * * property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time."

We make reference to the tariff in the instant case, item 50 of which reads: "The marked tare will be used to arrive at net weight of the load." Then two exceptions follow,

neither of which applies in the instant case. The marked tare, of which the defendant complains, was obtained by taking the stenciled numbers on the side of the coal cars carrying the cargoes, then the cars were weighed for the gross weight and the net weight was determined by the difference between the stenciled tare and the gross weight. The defendant complains that the stenciled weight so taken was placed, in the first instance, by one not called as a witness, and the mere fact that it was subsequently written and recorded constitutes hearsay evidence. With this contention we are unable to agree. The tariff specifically provided for using the marked tare weight of the carrier. The bill clerk and weighmaster weighed personally the eight cars for which the plaintiff claims recovery; produced the original scale tickets, showing the weight, gross and net, which were offered and received in evidence.

The tariff further provides for the reweighing of the coal at destination and for procedure with reference to loss caused by moisture. We will not set forth the separate items of the tariff with reference to reweighing of the cargoes at destination, because the defendant did not avail himself of such provisions. All freight charges had been collected by the carrier, except those as set forth in the petition.

We conclude that the court properly rejected the scale weigh tickets as offered by the defendant. The purpose of the interstate commerce commission is to regulate the transportation of commodities over the carrier lines to the consignee, and to provide regulations necessary to carry into effect rates, transportation and weighing. To repeat: The tariff provided that the carrier was privileged to take the marked tare weight; this was obtained from the stenciled figures on the side of the coal cars. The tariff further provided the method by which the defendant could have had the cargoes reweighed at the place of destination. This he did not do, but offered scale weights over his own private scales, to constitute the basis of his counterclaim and set-off, without proof of negligence on the part of the carrier in causing any shortage in the coal, and without proof of the

loss of coal by reason of transportation, except by defendant's scale weights over his private scales.

In the reasonable transaction of business of this kind, the regulations imposed by the interstate commerce commission for adopting and publishing tariffs with respect to the transportation of coal over the lines of common carriers serve a useful and necessary purpose. To permit evidence of weights over private scales, under circumstances as existed in the instant case, would lead to extreme difficulty and permit the raising of limitless contentions and confusion, as between common carriers and the consignees, and deny the effectiveness of the interstate commerce commission and the purpose for which it was created.

For the reasons given, the judgment of the trial court is

AFFIRMED.